JAMES BOSLEY *vs.* The CHESAPEAKE INSURANCE COM-
PANY.—*December,* 1831.

Where a variety of facts have been proved, a prayer making a partial enu-
meration of them, and thereupon asking an instruction to a jury, will not
be granted, if not sustained by a consideration of all the facts proved,
which belong to the question, whether enumerated or not.

An insured is not compelled in any case to abandon. He has an election
which rests in his discretion ; but no right to claim for a technical or con-
structive total loss vests, until such election is made.

An election to abandon for a total loss cannot be made, until receipt of
advice of the loss.

Intelligence of the loss of a ship derived from a newspaper, is sufficient ad-
vice to authorise an insured to abandon upon.

The information which is sufficient to authorise the assured, to give notice to
the underwriter, that he abandons, must be of such facts and circumstances
as would sustain the abandonment, if existing in point of fact, at the time
the notice is given.

The mere stranding of a vessel, does not of itself, form a substantive ground
of abandonment. The right to abandon on such an occurrence, depends
on the attending circumstances.

So where the assured addressed the following note to the underwriter : " I
observe by the *Boston* newspaper of the 29th January, that the ship S,
insured in your office, was driven ashore in a heavy gale of wind, the 6th of
December, and by a *Charleston* paper of the 26th of January, that on the
13th she was not got off. In so dangerous a situation as *Helvoet* roads, *it is
to be feared a total loss has ensued,* I therefore as a measure of precaution
both for your interest and my own, abandon to you, and claim a total loss."
HELD, that this letter did not state to the underwriter, a sufficient reason for
the offer to abandon. A mere apprehension that a total loss may have
taken place, does not authorise the offer.

To justify the reversal of a court's judgment, on the ground of their having
given an erroneous instruction to the jury, it must appear that the appel-
lant actually, or probably, did sustain an injury thereby. If it did him
no prejudice, no matter how erroneous, it forms no ground of reversal.

APPEAL from *Baltimore* County Court.

This was an action of *Covenant,* brought upon a policy
of insurance effected by the appellant, *Bosley,* with the ap-
pellees, *The Chesapeake Insurance Company.* The original
writ was sued out upon the 12th of July, 1823. The plaintiffs
declaration contained three counts. The *first* count alleged

that on the 12th day of December, 1822, at *Baltimore,* &c. by a certain policy of insurance, then and there made and sealed with the seal of the *Chesapeake Insurance Company* aforesaid, which the said *Bosley* here brings into court, &c. the *Chesapeake Insurance Company* did insure the said *James Bosley,* lost or not lost, at and from a port or ports in *Europe* to *Baltimore,* $15,000, upon the body of the good ship called the *General Smith,* whereof was the master for that voyage, —— *Robinson ;* beginning the adventure upon the said vessel, at and from the ports aforesaid, and so should continue and endure until the said vessel should be arrived at *Baltimore* aforesaid, and there moored twenty-four hours in safety. And it was by said policy declared and agreed, that it should and might be lawful for the said vessel, in her voyage, to proceed and sail to, touch and stay at any ports or places, if thereunto obliged by stress of weather, or other unavoidable accident, without prejudice to the said insurance ; the said vessel, her tackle and appurtenances, for so much as concerned said insurance, by agreement between the assured and assurers in the said policy, was valued at the sum insured. The perils and adventures which they, the assurers, took upon themselves, and were contented to bear in the said voyage, were of the seas, men of war, fire, &c. and all other such perils, losses and misfortunes as had or should come to the hurt, detriment or damage of the said vessel, or any part thereof, for which assurances are legally accountable ; and in case of any loss or damage, it should be lawful for the assured, their factors, servants and assigns, to sue, labor and travel for, in and about the defence, safeguard and recovering of the said vessel, or any part thereof, without prejudice to the said assurance : to the charges whereof they, the assurers, should contribute, according to the amount of the sum thereby assured. And so they, the assurers, were content, and did thereby bind the *Chesapeake Insurance Company* to the assured, their executors, administrators and assigns, for the true performance of the pre-

mises, confessing themselves paid the consideration for the assurance by the assured, at and after the rate of *two and a half per cent.; to return one per cent. if from one port :* in case of loss, the same was to be paid in ninety days after proof and adjustment thereof; the amount of the note for premium, if unpaid, being first deducted, provided such loss should amount to five per cent., under which no loss or damage was to be paid on ship, unless general, &c.   And the said *James* in fact says, that the said ship or vessel then and there being the property of the said *James*, and so ever after continuing to be, until and up to, and at the time of the loss hereinafter mentioned, and said *James* being then and continually as aforesaid interested in said ship, to the value of all sums insured thereon, was heretofore, to wit, on the 3d day of December, 1822, at a port in *Europe*, to wit, at the port of *Rotterdam*, to wit, at, &c. and then and there being the property as aforesaid of the said *James Bosley*, and being so the property of the said *Bosley* at the time of making said insurance, and said policy of insurance did, to wit, on the said 3d day of December, 1822, depart and set sail from a port in *Europe* as aforesaid, to wit, from the port of *Rotterdam*, on her said voyage in said policy mentioned, for and towards *Baltimore* aforesaid ; and that afterwards, and whilst the said vessel was proceeding on said voyage, to wit, on the 4th day of February, 1823, to wit, in *Helvoet* roads, to wit, at, &c. and before the completion of the voyage aforesaid, the said vessel was by the force and violence of the winds and waves, and by the perils and dangers of the seas, forced, driven and cast upon and against certain shoals and banks, and thereby, and by drift of ice, then and there, became strained, disjointed, broke and damaged, insomuch that the said vessel thereby then and there was wholly lost to the said *James*, and a large sum of money, to wit, the sum of $2,000, was then and there expended by the said *James*, in and about the safeguard, recovery, defence and preservation, and toward the reparation of said vessel ; which said sums of money

so paid, laid out and expended, and the said sum of $15,000, the defendants became and were liable to pay the said *James* according to the tenor and effect of the said policy of insurance ; of all which premises the said *Chesapeake Insurance Company*, to wit, on the 4th day of February, 1823, had notice, to wit, at, &c.

*2d Count.* After referring to the same policy, it averred, —And the said *James* does in fact say, that the said ship or vessel was, to wit, on the 3d day of December, 1822, in good safety at a port in *Europe*, to wit, at the port of *Rotterdam*, and that afterwards, to wit, on the said 3d day of December, in the year last aforesaid, the said ship departed and set sail from the port in *Europe* aforesaid, to wit, from the port of *Rotterdam* aforesaid, for and toward *Baltimore* aforesaid, on her voyage in said declaration mentioned ; and that whilst the said ship was proceeding on her said voyage, and before the completion thereof, and her arrival at her port of destination aforesaid, to wit, on the 4th of February, 1823, to wit, in *Helvoet* roads, &c. by the perils and dangers of the seas, was stranded, and wholly lost to the said *James*, and that large sums of money, to wit, to the amount of $2,000, were then and there expended by said *James*, in and about the safeguard, defence, recovery, and preservation and reparation of said ship, which said sum of money, and the said sum of $15,000, the defendants became and were liable to pay to the said *James*, according to the tenor and effect of said policy of insurance; and the said *James* in fact says, that at the time of making the said policy of insurance, and continually thence up to and at the time of the loss aforesaid of said ship, the said ship was his property, and that he was interested therein as valued, to the value of all the sums insured thereon as aforesaid, of all which premises the *Chesapeake Insurance Company*, to wit, on, &c. at, &c. had notice.

*3d Count.* Alleged as a breach of the covenants in the same policy—that before the completion of her said voyage, to wit, on the 4th of February, 1823, to wit, at *Helvoet* roads, to wit, ·

&c. at, &c. before the arrival at her port of destination, *Baltimore* aforesaid, by the perils and dangers of the seas, and by stormy and tempestuous weather, and the violence of the winds and waves, was bulged, broken, and damaged, and destroyed, insomuch that the said vessel then and there became wholly lost to the said *James*, and a large sum of money, to wit, the sum of $2,000, was then and there expended by the said *James*, in and about the safeguard, defence and recovery, and preservation and reparation of the said vessel; which said sum of money, and the said sum of $15,000, the defendants, according to the tenor and effect of the said policy, became and were liable to pay said *James*; of all which premises the *Chesapeake Insurance Company* aforesaid had notice, to wit, &c.; yet the said the *Chesapeake Insurance Company*, although, &c.

To this declaration, the defendants below pleaded that they had not broken their covenant, upon which issue was joined.

1. At the trial of this cause, a variety of depositions, documents, and letters, were read, which the reporters do not deem it necessary, for the understanding of the points ultimately decided by either court, to introduce, but have prepared the following general statement of the evidence offered to the jury.

The plaintiff, to support the issue on his part, proved his property in the ship, the policy of insurance declared upon, and that he had tendered a deed of cession to the defendants, for his interest in the ship *General Smith*, which they refused to accept. He then read to the jury the following copy of a letter sent to the defendants:

"*Baltimore*, 4th February, 1823.—*Gentlemen*—I observe by the *Boston* newspaper of the 29th January, that the ship *General Smith*, insured in your office pr. policy No. 7661, was driven ashore in a heavy gale of wind the 6th of December, and by a *Charleston* paper of the 26th of January, that on the 13th she was not got off. In so dangerous a situation as *Helvoet* roads, it is to be feared that a total loss

has ensued. I therefore, as a measure of precaution for both your interest and my own, do hereby abandon to you, and claim a total loss. Respectfully, gentlemen, your obedient ser'vt. (Signed,) *James Bosley.*
To the President and Directors of the *Chesapeake Insurance Company."*

The plaintiff then further offered proof, that the ship *General Smith,* upon the voyage mentioned in the policy of insurance declared upon, set sail in ballast from *Rotterdam* for *Baltimore,* on the 3d of December, 1822, and anchored about four miles below *Rotterdam,* on the same day; that on the 5th of December, being at anchor at *Helvoet* roads, with a pilot on board, a violent squall from the S. and W. struck the ship and drove her aground; that on the 6th, a violent gale coming on, notwithstanding the exertions of the master and crew, the ship was driven 100 fathoms upon a mud bank by the force of the wind; that on the 7th the gale moderated; that every exertion was made to get the ship off, without avail; that she fell on her beam ends; at low water the bank was dry, and the people from the ship could walk around her, when she was from 200 to 300 yards from the edge of the water; that ice began to form about the middle of December, and made around the ship in large banks. The ship's ballast was, while she was aground, thrown overboard; assistance was procured from the shore, but with every exertion, the ship was not got off. She remained aground until from the 1st to the 4th of February, when she was at times afloat in her bed on the mud bank. On the 5th the ship floated, but as the ice had then broken, and there was much danger from getting among it, every exertion was made to keep her on the bank, and prevent her getting into the channel way. On the 13th of February, the ship was finally got off, and proceeded to *Williamstadt,* and afterwards to *Dort,* where she was hove out, both sides caulked at a heavy expense, and on the 13th of March again set sail for *Baltimore,* where she arrived on the 6th April, in a leaky condition.

There was evidence that while the ship was aground, she was materially injured, strained and hogged; that the place on which she grounded, was very much exposed, the weather cold and severe, the crew greatly exposed and frostbitten; that the master was a man of skill and intelligence in his profession, faithful and attentive to his duties. After the ship's arrival at *Baltimore,* she was libelled by the seamen for wages, condemned, and sold under a decree of the District Court of the *United States.* The ship after being sold under the decree, was repaired in *Baltimore,* at considerable expense, and went to sea again.

The defendants offered evidence that the place where the ship was aground, was a soft mud bank, and that she could have been got off the bank at any time with proper exertion, and with little or no damage, and at no great expense; that she was not hogged by being ashore, and that she is still a good ship. Thereupon the plaintiff by his counsel, prayed the court to instruct the jury as follows;

*First.* If the jury find from the evidence that *Captain Robinson,* the commander of the ship in question on the voyage insured, was a man of integrity, and competent skill in his profession, and that after the ship was driven on shore in the manner stated in the testimony, he acted according to the best of his judgment for the interest of all concerned; and if the jury also find, that on the *4th of February,* 1823, the time of the plaintiff's abandonment, the ship still continued on shore, and also continued on shore until the 13th of that month, and was at the time of said abandonment, and for some time before and after, in imminent danger of being wrecked and lost, that then the plaintiff is entitled to recover for a total loss, notwithstanding the ship was afterwards saved, and notwithstanding the jury may find that said *Robinson* might have erred in not choosing other means within his power, better fitted to the saving of his said vessel; provided they be of opinion, from all the evidence, that said error was such as a man of ordinary skill and judgment, and experience in

the commanding of ships, might, under like circumstances, have committed.

*Second.* If the jury, find from the evidence, that the ship *General Smith,* on or about the 4th day of December, 1822, sailed from *Rotterdam* for *Baltimore,* on the voyage mentioned in the policy of insurance on which this suit is brought, and while on the said voyage was, on or about the 5th of December, 1822, driven on shore near *Helvoet,* in the manner stated in the testimony; and if the jury also find, that the ship continued on shore until February 13th, 1823, and that during all that time while she was thus on shore, *captain Robinson,* the master of said vessel, acting according to the best of his skill and judgment, for the interest of all concerned, endeavored to get the vessel afloat to pursue her voyage, whenever he supposed it to be practicable, and safe to do so ; and in, and as, to said endeavoring, acted as a man of ordinary skill and judgment, and experience in the commanding of ships, would, in like circumstances have acted; and if the jury also find, that the said *Captain Robinson* was a man of integrity, and of competent skill in his trade and business as master and commander of such a ship as the *General Smith,* for the voyage insured, and that notwithstanding the exertions so made, the said vessel, at the time the abandonment was made, continued aground and on shore, and incapable, therefore, of pursuing her voyage ; and if the jury also find, that at the time of said abandonment, it was, and continued to be, uncertain and doubtful, whether she could ever be got off in safety, then the said abandonment is valid, and the plaintiff entitled to recover for a total loss.

*Third.* If the jury find from the evidence, that the ship *General Smith,* on or about the 4th of December, 1822, sailed from *Rotterdam* for *Baltimore,* on the voyage mentioned in the policy of insurance, on which this suit is brought, and while on the said voyage, was, on or about the 5th of December, 1822, driven on shore near *Helvoet,* in the manner stated in the testimony ; and if the jury shall

also find, that the said ship continued on shore until the 13th of February, 1823, and that during all that time, while she was thus on shore, *Captain Robinson*, acting according to the best of his skill and judgment, and as a man of ordinary skill and judgment, and experienced in the commanding of ships, would, in like circumstances, have acted, endeavored, whenever it appeared to have been practicable and safe to do so, to get the ship afloat, to pursue her voyage; and if the jury also find, that the said *Captain Robinson* was a man of integrity, and of competent skill in his profession, as commander of such a ship as the *General Smith*, for the voyage insured, then, that the ship was by being so cast on shore, arrested, and restrained in her voyage by perils insured against, and on the 4th of February, 1823, had been detained for an unreasonable length of time from the free use and possession of the plaintiff, and therefore the said abandonment is valid, and the plaintiff is entitled to recover for a total loss.

*Fourth.* If the jury find from the evidence, that the ship in question was driven on shore on or about the 4th of December, 1822, near *Helvoet*, when pursuing the voyage described in the policy of insurance on which this suit is brought, and continued on shore from that time until February 13th, 1823, and was thereby strained, broken and injured, to the extent and amount of more than half her value, that then the abandonment is valid, and the plaintiff is entitled to recover for a total loss, provided the jury shall also find, that during all the time the said ship was thus on shore, *Captain Robinson*, the master of said vessel, acted according to the best of his skill and judgment for the interest of all concerned, in and as to endeavoring to get the vessel afloat to pursue her said voyage, and as a man of ordinary skill and judgment, and experience in the commanding of ships, would, in like circumstances, have acted; and provided also, that they find that the said *Captain Robinson* was a man of integrity, and of competent skill in his trade

and business as a master and commander of such a vessel as the *General Smith,* for the voyage insured.

And thereupon the defendants, by their counsel, prayed the court to give the following instructions to the jury.

*1st.* That if the jury shall find from the evidence in the cause, that after the ship was blown ashore in *Helvoet* roads, she might have been got off at any time anterior to the 13th of February, 1823, at an expense of less than half her value, and been enabled thereby to prosecute her voyage without further delay, and that the means of getting her off were not employed by the master of the ship, owing to his unwillingness to make the expenditure, from an apprehension that it would not be approved and sanctioned by the plaintiff, his employer, and that the ship was thereby delayed in the prosecution of her voyage, from the 6th of December, 1822, to March, 1823; that this delay having been unnecessary, was a deviation, which discharged the underwriters from all damage sustained by the ship subsequent to the time, at which she might have been got off.

*2d.* That if the jury shall find from the evidence in the cause, that the intelligence placed before the defendants by the plaintiff's offer to abandon, of the 4th of February, 1823, did not present the case of an entire destruction of the ship, nor a case in which she had been damaged to more than half her value, nor a case in which a total loss from stranding was in the highest degree probable, the case was not one in which the plaintiff was authorised to abandon, and claim for a total loss, and the plaintiff is entitled to recover only for a partial loss.

*3d.* That if the jury shall find from the evidence in the cause, that the intelligence placed before the defendants by the plaintiffs offer of abandonment, of the 4th of February, 1823, presented a case in which it was probable that the ship might have been got off from the shore in a reasonable time, at an expense of less than half her value, the case was not a proper case for abandonment, and the plaintiff can only recover for a partial loss.

*4th.* That if the jury shall find from the evidence in the cause, that the ship when blown ashore in *Helvoet* roads, and detained there from the 6th to the 13th of December, in the manner described in the plaintiff's offer of abandonment of the 4th of February, 1823, was not in imminent danger from stranding, but was in imminent danger of being detained on the shore till ice would be formed, which might cut her to pieces, that such apprehended danger from ice not having been assumed as the ground of the offer to abandon, cannot be relied on by the plaintiff to support the abandonment; and even if it had been assumed as the ground of the offer to abandon, that the mere apprehension that ice would form, which might cut the ship to pieces, however reasonable such apprehension may have appeared, would have given no right to abandon: and that the plaintiff, had such been the ground of the offer to abandon, could only have recoved for a partial loss.

*5th.* That if the jury shall find from the evidence in the cause, that on the 4th of February, 1823, when the offer to abandon was made, the danger of a total loss from stranding was not in the highest degree probable, and that at that time, the only danger that existed, was the danger of the ship's being borne by the water from the shore out into the current among the floating ice, and of being destroyed by the ice; the case was not on the 4th of February, 1823, a proper case for abandonment on the ground assumed by the plaintiff in his offer of abandonment of that date; nor would the case have been a proper one for abandonment had the plaintiff there known and assumed the said apprehended danger from the ice, as the ground of his offer to abandon; and that on the state of facts assumed in this prayer, he is entitled to recover only for a partial loss; but the court rejected each and every of the said prayers of both plaintiff and defendants, and were of opinion, and directed the jury as follows: That the plaintiff's intelligence of the state of his vessel, authorised the abandonment as offered in evidence, provided the existing state of facts on

the 4th of February, authorised an abandonment for a total loss; that the danger from being cut to pieces from the ice, was one of the perils to which the stranding of the vessel exposed her, and if on the 4th of February she was damaged to the amount of more than one-half her value, or was in imminent peril, and the highest degree of probability of actual or technical total loss existing, then the plaintiff is entitled to recover for a total loss, unless the captain had reason to believe that she could be got off in safety, for one-half her value, before the 4th of February, and from any cause whatever neglected to attempt it; that is to say, he was bound to go up to the amount of half her value, unless he had reason to believe that the means actually used by him were sufficient for that purpose. To which rejection of said prayers, as made by the plaintiff, and to the said opinion and direction of the court, the plaintiff excepted.

The cause having been submitted to the jury, under the foregoing instructions, they found a verdict of $5,786 36, for the plaintiff. Whereupon the plaintiff appealed to this court.

The cause was argued before BUCHANAN, Ch. J., EARLE, and DORSEY, J.

*Mayer, Johnson,* and *Taney,* (Att'y Gen'l U. S.) for the appellants, cited, *Rhinelander vs. Ins. Co. Penn,* 4 *Cranch.* 41. *Marshall vs. Delaware Ins. Co.* 4 *Cranch,* 206, 208, 2 *Marshall,* 578. *Lawrence vs. Ocean Ins. Co.* 11 *Johns.* 293, 295. *Wood vs. Lincoln and Kennebeck Ins. Co.* 6 *Mass. Rep.* 482. *Phil. on Ins.* 459. *Peele vs. The Merchants' Ins. Co.* 3 *Mason,* 27, 29, 41, 48, 53, 57, 58, 65. 2 *Mar.* 586. *Columbian Ins. Co. vs. Catlett,* 12 *Wheat.* 391. *Idle vs. The Royal Exchange Co.* 4 *Serg. and Low,* 279. *Green vs. The Royal Exchange Co.* 6 *Taunt.* 71. *Bishop vs. Pentland,* 14 *Serg. and Low,* 33. *Phil. on Ins.* 442, 448. 2 *Mar.* 598, 9, 601. *Ralston vs. Union Ins. Co.* 4 *Binney,* 386, 403. *Dorr. vs. New Eng. Mar. Ins. Co.* 4 *Mass.* 230. 3 *Kent,* 268. *McIver vs. Henderson,* 4 *Maul. and Sel.*

576. *Goss vs. Withers,* 2 *Burr.* 683. *Miller vs. Fletcher,* *Doug.* 231. *Park.* ch. 9, 219. *Phill. on Ins.* 442. *Ib.* 391. *Anderson vs. Wallis,* 2 *Maul. and Sel.* 248.

· *Glenn,* and *Wirt,* for the appellee, cited, 2 *Mar.* 590, 565, 601. *Dederer vs. Delaware Ins. Co.* 2 *Wash. C. C. R.* 61. *Phil. on Ins.* 448. *Peel vs. The Merchants' Ins. Co.* 3 *Mason,* 27. 3 *Kent.* 265, 249. *Hughes on Ins.* 416. *Bell on Ins.* 610. 2 *Mar.* 586. *Columbian Ins. Co. vs. Cat-lett,* 12 *Wheat.* 391. *Anderson vs. Wallis,* 2 *Maul. and Selw.* 240. *Everth vs. Smith, Ib.* 278. *Falkner vs. Ritchie, Ib.* 290. *Brotherston vs. Barber,* 5 *Ib.* 418. *Cologan vs. London Assurance Co. Ib.* 446, 447. *Patrick vs. Com. Ins. Co.* 11 *Johns.* 13. *Suydam and Wyckoff vs. Marine Ins. Co.* 1 *Johns.* 181, 183. *King. vs. Delaware Ins. Co.* 2 *Wash. C. C. R.* 309. *Phil. on Ins.* 448. *Wood vs. Lincoln and Kennebec Ins. Co.* 6 *Mass.* 483. 11 *Petersd.* 466.

DORSEY, J., delivered the opinion of the court.

The first and third bills of exceptions, on the part of the appellant having been waived or abandoned, our duty is to inquire whether there be such error in the County Court's instruction to the jury, or their refusal of the appellant's prayers in his second bill of exceptions, as would require a reversal of their judgment? The propriety of the court's denial of the several instructions which they were called on to give, will be first examined.

The first prayer presents an hypothetical statement of facts, not enumerating all which had been proved, but predicated upon, and assuming the existence of those material facts, of which competent and adequate testimony had been offered, and the finding whereof, was indispensible to a recovery. These facts set forth in the bill of exceptions, were as fully in the view of the court, in making a disposition of the points presented, were as necessarily subjects of consideration, as if they had been incorporated in the statement itself. The instruction requested could not for

a moment have been sustained; nay, could not have been asked for, but upon this assumption.

The abandonment, one of those important links in the chain of testimony, is expressly referred to, and was to be regarded in the same manner, as if the proof, by which it was established, had been set out in the statement. If no sufficient abandonment had been made, the instruction prayed for could not have been granted. The finding of the facts enumerated, could of themselves form no basis of a recovery, as for a total loss. Before the court could have instructed the jury, that the plaintiff was entitled to such a verdict, they must of necessity have determined, that it was warranted by the abandonment. The sufficiency of the abandonment, the correspondence of its grounds with those relied on as evidence of loss, were clearly submitted for, and settled by the determination of the court below; and notwithstanding the act of 1825, in reviewing their judgment, form fit subjects for discussion before this tribunal.

The insured is not compelled in any case to abandon, he has an election, which rests in his discretion; but no right to claim as for a total loss in its nature technical or constructive, can vest, until such an election be made. He can only abandon for a total loss; and his election to do so, can never be made until the receipt of the advice of the loss. It has been urged by the appellees, that the intelligence of loss communicated in this case, was of such an unauthentic nature, that the assured was not authorised to rely on its verity, and deal with the underwriters accordingly. But we cannot yield our assent to this suggestion. The information received would have carried conviction to any reasonable mind; was positive, untainted by any suspicions as to its truth; and if the facts which it made known, justified his abandoning, the insured was not bound to wait for more authentic advice.

Were the underwriters liable for a total loss, under the abandonment in the case at bar, is the first question to be

disposed of. Before the expression of our opinion, let us refer to some of the authorities pertinent to this subject. In 1 *Johns.* 181. *Suydam, et al. vs. Marine Ins. Co.* the court say, abandonment must be "on sufficient grounds, and the accident occasioning it, must be described with certainty, so as to enable the underwriter to determine, whether he be bound to accept. If he be not, he will of course refuse, and neglect to take measures for its preservation, which is one object of making an abandonment." A similar principle is found in the court's opinion, in *King vs. Del. Ins. Co. 2 Wash. C. C. Rep.* 309. It is incumbent on the insured to state to the underwriter a sufficient reason for the offer to abandon. "This is clear from the nature and use of an abandonment. The underwriter should have an apportunity of judging whether he is bound to accept the offer or not. If bound, that he may do so at once, and take proper means for the preservation of the property." As the assured must at the time of abandoning, state the grounds upon which he makes the abandonment, it is necessary, in order to make the act valid, not only that the existing facts should constitute a total loss; but also that the assured should be informed of the accident, which occasions the loss. He cannot abandon merely upon the apprehension, that a total loss may have taken place, and afterwards establish his right to do so, by facts that subsequently come to his knowledge, and which were wholly unknown to him at the time of making the abandonment. *Phil. Ins.* 440. "The underwriters ought to know the grounds of the abandonment, that they may determine whether to accept. Accordingly, the assured must at the time of making the abandonment, make known to the insurers, the reasons for which he abandons. He cannot avail himself of any other ground, than that alleged by him at the time of abandoning; and if there be any other facts, (either known, or not known to him at the time,) on which an abandonment would be necessary, in order to entitle him to recover for a total loss, he must abandon anew, before he can recover for such a

loss, on account of those facts." *Phil. Ins.* 448. "The facts of which the insured is informed, and which he makes known to the underwriters, as the ground of his abandonment, must constitute a total loss." *Phil. Ins.* 458.

From the authorities referred to, as well as upon principles of reason, justice and policy, we deem this rule undeniable, that the information which is sufficient to authorise the assured to give notice to the underwriters, that he abandons, must be of such facts and circumstances, as would sustain the abandonment, if existing in point of fact, at the time the notice is given. The mere stranding of a vessel, forms not of itself, a substantive ground of abandonment. The right to abandon on such an occurence, depends on the attending circumstances. If she be thrown so high upon the beach that her removal is impracticable, or if on a shore where the means of relief are unattainable, or where the exertion of those means would incur an expenditure exceeding half her value, then is the assured at liberty to abandon. To sustain this doctrine so constantly met with in the decisions of courts of justice, and in writers upon the law of insurance, it cannot be necessary to refer to authorities.

What was the intelligence communicated in this case? Simply this, "I observe by the *Boston* newspaper of the 29th January, that the ship *Genl. Smith,* insured in your office, per policy No. 7661, was driven ashore in a heavy gale of wind, the 6th December, and by a *Charleston* paper of the 26th January, that on the 13th she was not got off. In so dangerous a situation as *Helvoet Roads,* it is to be feared that a total loss has ensued." It has not been contended, that the fears of the insured are equivalent to a total loss, and constitute a ground of abandonment. There is no such head in insurance law, as abandonment *quia timet.* Do the facts disclosed in the notice show a total loss, either actual or technical? for unless they do, the abandonment is wholly defective. If mere stranding be not a total loss, there is no total loss disclosed by the notice. The only facts upon

which such a conclusion could rest, are, that in a gale of wind, the ship was driven on shore, and had remained there seven days.   But whether she remained there from choice, to make some inconsiderable repair, as for example, to re-ship her rudder, or from necessity; whether she was thrown one foot, or one mile, from the channel of the river; whether she laid high and dry, or in ten feet water; whether she had sustained any damage by the accident; whether any effort had been made to get her afloat; or whether the accomplishment of that object was impracticable, or could be accomplished by the expenditure of ten dollars, or ten thousand dollars, were matters on which the insurer were left to speculate in utter darkness.   Can it seriously be urged that the underwriters, by the tenor and spirit of their contract, under such circumstances, were bound to have accepted the abandonment, and thus become the purchasers of the ship, at the valuation in the policy ? If there be any case to sustain such pretensions of the appellants, it has not been cited in the argument, and certainly has eluded the researches of the court.

It has been contended, " that an abandonment does not depend on the information given at the time it is made, but on the facts, or state of the property, at the date of the abandonment." This position cannot be sustained; it has neither principle nor authority to support it.   If it were true, it would follow that an abandonment would be effectual where a loss had occurred, although a knowledge of such loss, had never reached either the insurer or insured— that the insured need not make known the intelligence he has received of the disaster—that information of the slightest impending peril would support an abandonment, if at the time it was made, the condition of the thing insured constituted a total loss ;—that such doctrine is at war with every adjudicated case on the subject, it can hardly be necessary to remark. Suppose both the insurer and insured to have resided at *Rotterdam,* or in the immediate vicinity of the place

of stranding, and that on the 13th of December, (the time when the facts relied on, as showing a total loss,) the abandonment had been made; and made too, not only on the grounds stated in the notice, but upon all the circumstances connected with the disaster, could it be insisted that a total loss then existed, in point of fact, or was "in the highest degree probable," or that the moral certainty of its occurrence was such, that upon principles of reason or law, it might be assumed as having already taken place? The ship lay on the bank, free from injury, save an unimportant one to her rudder, which had been repaired. Nothing was required to place her in a state of safety in the stream, but a shifting of the wind to the northward or westward. Could the loosest *dictum* that ever escaped a judicial tribunal, make such a state of things a total loss? If the right of abandonment existed not where the contracting parties resided, at the theatre of the disaster, it derives no additional strength from the fact of their residence being several thousand miles distant. The claim to abandon, depends altogether upon the nature of the intelligence received, which must be communicated to the assurer; but here it is attempted to sustain this abandonment, not upon the facts received by the assured, and made known to the underwriters, nay, not even upon the actual condition of the property insured, at the date to which the intelligence relates, but upon accidental contingencies, transpiring a month or two months afterwards, and never previously submitted to the insurer, as the basis of the claim. The sufficiency of an abandonment rests not merely on the occurrence of facts, which constitute a total loss, but upon their knowledge by the assured, the communication thereof to the assurer, with an offer to abandon, and the continuance of the disaster at the date of the abandonment.

Were we to extend the right of abandonment to the extent to which it has been insisted on in the present trial, it would be carried much beyond any limits heretofore prescribed to it. According to our view of the subject, this

right has been already expanded as far as expediency or justice will tolerate. A policy of insurance is a contract of indemnity, not of sale. If, on light grounds, or mere probabilities of loss, a right of abandonment arises, you convert underwriters into traders, and impose on them, if they regard the interests they represent, the duty of inquiring into the nature and value of the cargo insured, the grounds upon which rests the calculation of profit from the commercial adventure, and all the probable consequences of a coercive sale, at a port intermediate the *termini* of the voyage; thus compelling the insured to make public that commercial intelligence, upon which his adventure is predicated, and upon the concealment of which depends the success of his enterprise. There is much good sense in the remark by *C. J. Willes*, in *Willes' Rep.* 640, "that insurances were contracts of indemnity, and not for profit or gain;" and there is equal wisdom in what is found in a learned commentary on insurance law, *Hughes' Ins.* 415.—"It is clear that a policy of insurance, both in its object and form, is merely a contract of indemnity. It contains no stipulation respecting abandonment, has its origin from the nature of the contract, as a contract of indemnity. The underwriter does not stipulate, under any circumstances, to become the purchaser of the thing insured; it is not supposed to be in his contemplation; he is to indemnify only. This being the principle, a practice or doctrine which is calculated to break in upon it, ought to be narrowly watched."

The cases of *Peele et al. vs. The Merchants' Ins. Co.* 3 *Mason*, 27, and *Fontaine vs. The Phœnix Ins. Co. New-York*, 11 *Johns.* 293, have been much relied on by the appellants. But is there the slightest similitude between the nature of the facts shewing the loss in those cases, and those which belong to the case before us? In the case in 3 *Mason*, the *Argonaut* was cast upon the rocks, bilged, the tide flowed freely through her, her sails and rigging cut from the masts, all her furniture removed for safety, the master and crew had deserted her expecting her to go to

pieces, if the wind had veered to the north-west, her destruction inevitable, and her situation was so desperate, that there remained of her recovery, but a glimmering ray of hope; under these circumstances, Justice *Story* held the loss to be total, in accordance with the opinion of *Lord Ellenborough*, who in *Anderson vs. Wallis*, 2 *M. and S.* 240, says, "there is not any case, nor principle, which authorises a total loss, unless where the loss has been actually a total loss, or in the highest degree probable, at the time of abandonment." In the case in 11 *Johns.* the vessel was driven against the rocks at *St. Pierre, Martinique*, and beating against them some time, was driven so high on shore, that when the gale subsided and the sea became calm, there was only two or three feet water on the out side of her. The master, mate, and supercargo, made depositions that it would cost more than her value to get her off; that a survey was had of the vessel, and she was condemned, and sold: the purchaser afterwards got her off at an expense of $500. The court held, that her situation being desperate at the time of the survey, the subsequent good fortune of the purchasers did not destroy the plaintiff's right to recover for a total loss, unless the jury believed she could have been got off for half her value. It is unnecessary to draw the strong lines of discrimination existing between the cases cited, and that now under consideration. They are authorities against the appellant's right to recover.

This first prayer appears to have been framed, and it was so argued before us, as if intended to call on the court to decide, that "imminent danger of being wrecked and lost," justified abandonment, and recovery for a total loss. In this aspect of the prayer, we entirely concur with the County Court in its rejection : mere "imminent danger" of a total loss, never has been deemed sufficient ground to entitle the assured to a verdict for a total loss. The courts have only gone thus far in the cases, where danger was not only imminent, but the loss in the highest degree probable.

We wish to be understood as not expressing any decided opinion in this case, whether if all the circumstances connected with the stranding of the *General Smith*, from the 5th of December, 1822, to the 6th of February, 1823, or to any previous day, had been inserted in a notice of abandonment, delivered to the underwriters, that the plaintiff would not be entitled to recover for a total loss, but as at present advised, we should deliberate much, and long, before our minds could be brought to the adoption of such a conclusion.

The second prayer has been discussed, as if presenting the question, whether the loss were not total, "as by the stranding of the ship, she, for all the useful purposes of a ship for the voyage, is, for the present, gone from the control of the owner, and the time when she will be restored to him in a state to resume the voyage, is uncertain." As conclusive of the affirmative of this question, and to show that the right to abandon is immediate and complete, the appellant relies on the rule laid down by Justice *Story*, in the case of *Peel et al. vs. The Merchants' Ins. Co.* 3 *Mason*, 65, where a learned and elaborate review is taken of most of the *English* and *American* cases on the subject, in the conclusion of which, that enlightened jurist says, "the right to abandon exists, whenever, from the circumstances of the case, the ship, for all the useful purposes of a ship for the voyage, is, for the present, gone from the control of the owners, and the time when she will be restored to him in a state to resume the voyage, is uncertain, or unreasonably distant, or the risk and expense are disproportioned to the expected benefit, and objects of the voyage." This literal construction, and technical application of the rule, is wanting in candor and justice to the learned judge. His rule was extracted from the adjudicated and admitted principles and cases that he refers to, which immediately precede it, and on which he relies as its basis. It ought not, therefore, in fairness, to be applied to cases in no wise analogous in their circumstances: but admitting the correctness of its application to the perils enumerated, embargoes, blockades,

detentions, submersions, and shipwrecks, which cannot be repaired in the ports where the disasters happen, it surely is not a fair, or rational interpretation of the judge's opinion, to embrace within it the case of mere stranding, when in a preceding part of the same opinion, he states it to be a position "incontrovertible, that the mere stranding of the ship is not, of itself, to be deemed a total loss, so as to entitle the insured immediately to abandon." If, however, the true exposition of this rule, be such as is given it by the counsel of the insured, we must be excused in withholding from it our approbation. They allege that the *General Smith* being aground, "for all the useful purposes of a ship for the voyage, is, for the present, gone from the control of the owner, and the time when she will be restored to him, in a state to resume the voyage, is uncertain," and therefore the insured may rightfully abandon. By the same system of reasoning, every stranding would confer the same right ; as the time of disentanglement from such a peril, is ever a matter of uncertainty. Before we could yield our assent to the rule thus literally expounded, the words, "and the time when she will be restored to him in a state to resume the voyage is uncertain," must be stricken out, and their place supplied by the following insertion : "and that she will, be restored to him in a state to resume the voyage, is highly improbable." But we must not be understood, as recognising this literal and forced construction of an isolated section of the court's opinion. It is manifestly contradicted both by what precedes and follows the introduction of this clause : mere stranding being in *limine,* alleged to be no ground for abandonment, and the first sentence that follows the rule, and which was designed to illustrate and announce its true meaning and operation, and the ground upon which it was predicated, declares, "that in such a case the law deems the ship, though having a physical existence, as ceasing to exist, for purposes of utility, and therefore subject to be treated as lost." Could such an absurdity be imputed to the law, that it should deem a ship as ceasing to exist for purposes of

utility, and be treated as lost, because she was grounded on a beach, from which she would be extricated by the first favorable change of the wind?    Such was the condition of the ship, now the subject of litigation, at the time she was seen by those whose reports of her disaster reached the owner, and formed the ground of his abandonment.    But it is an useless consumption of time, to inquire whether the facts relied on in the second, third, and fourth prayers of the appellants, in contemplation of law, amount to a total loss.    They were not made the grounds of abandonment, nor are they consequences to have been anticipated, as necessarily flowing from them: the offer to abandon, having failed to show the condition of the ship desperate, her total loss, in the natural course of things, inevitable, or " in the highest degree probable," was wholly invalid, and consequently, the very *substratum* of the plaintiff's action having failed, all prayers sanctioning his right to recover for a total loss, were properly rejected by the court.

Having disposed of the first branch of this case, the only remaining inquiry is, has the appellant any just reason to complain of the instruction given by the court to the jury. To justify the reversal of a court's judgment, on the ground of their having given an erroneous instruction to the jury, it must be made appear, that the appellant actually, or probably, did sustain an injury thereby.    No matter how erroneous the instruction, if it could work no prejudice to the appellant, it forms no ground for reversal.    So far from the appellant being prejudiced by the court's instruction, it conferred on him an essential benefit, to which, in our view of the subject, he was not entitled.    It permitted the jury, upon a state of facts which they were left at liberty to find, to give the appellant a verdict as for a total loss, whereas the direction ought to have been, that from the insufficiency of the abandonment, they were not authorised to give such a verdict, no matter what the proof might be.    Therefore, although we disapprove, in part, of the instruction given to

the jury by the court below, we deem it no fit subject of complaint to the appellant.

Concurring with the County Court in their rejection of the appellant's four prayers, in the second bill of exceptions, and seeing no ground of reversal in their instruction to the jury, we affirm the judgment.

**JUDGMENT AFFIRMED.**

*Note.*—After the verdict in this cause, the plaintiff moved for a new trial; and filed in court as the foundation of that motion, the depositions of nine of the jurymen,—declaring, that they had considered in making up their estimate of the plaintiff's damages, that he had received the proceeds of the sale of the ship *General Smith,* at or about the time of her being sold by the Marshall, in July 1823, and that he had been accordingly charged with interest upon such proceeds, from the supposed time of its receipt by him, until the *rendition* of the verdict, and that they believed the other jurors acted upon the same views.—The fact was, that the plaintiff received those proceeds in 1827. The motion for a new trial was resisted, upon the principle, that the deposition of a juror, was not competent evidence to prove this mistake; and the whole subject was most elaborately discussed.

The County Court, ARCHER, J.—I have carefully examined the cases cited in the argument of this case, and am of opinion, that the testimony of jurors cannot be heard to impeach their verdict, whether the conduct objected to in the jury, be misbehaviour or mistake. The New York cases are full to this point—so are the cases in England, since the revolution, though very contradictory before that period. The cases in 2 T. R. in 6 *Cowan,* and 1 *Wendall,* decide, that no evidence can be received from the jury, to show mistake. I think these decisions right, because, were the law different, an inquisition might be instituted in every case, into the grounds and motives of a jury for their finding, in order to ascertain whether, in coming to given conclusions, they had not mistaken facts. Verdicts of juries, would then in all cases, be uncertain. To permit such inquisition into the motives of juries, would, it appears to me, be against public policy, and lead more frequently to the prostration of justice, than to its preservation.

Independent of the above ground, I should be opposed to a new trial in this case. Treating the loss of the plaintiff as partial, and not as total, (for with this branch of the jury's finding, no fault has been found,) I am not satisfied that injustice has been done to the plaintiff. He has obtained a verdict for $5786, and has received $4692 from the sale of the vessel, making in all, the sum of $10,478.—Now when the probable deterioration of such a vessel, on such a voyage, is taken into consideration, I am by no means clear, that the indemnity of the plaintiff has been inadequate. Besides, considering this as a partial loss, the time when Mr. Bosley received the pro-

ceeds of the sale, would seem to be entirely immaterial to any just determination of the case,—for if the loss were partial, the property in the vessel and its proceeds always remained in him, and he might employ them, or let them remain idle, without at all affecting the subject matter of inquiry here.

The motion for a new trial is overruled.