### WILLIAMS *v.* STATE

[No. 65, October Term, 1953.]

### JONES *v.* STATE
(Two Appeals in One Record)

[No. 82, October Term, 1953.]

*Decided February 11, 1954.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. A. C. Hughes, Jr.,* and *Juanita Jackson Mitchell* for appellants.

*Ambrose T. Hartman, Assistant Attorney General,* with whom were *Edward D. E. Rollins, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *Edwin A. Gehring and Theodore C. Waters, Jr., Assistant State's Attorneys,* on the brief, for appellee.

SOBELOFF, C. J., delivered the opinion of the Court.

The interest and importance that attach to the issues raised in this case are vastly disproportionate to the small fines imposed by the Criminal Court of Baltimore City—$25 and $50 on the appellants Williams and Jones upon their conviction on one count and two counts respectively—for assault and battery on police officers and a police matron. We permitted consolidation of the appeals because the convictions were based upon facts practically identical.

Appellants contend that the charges of assault and battery cannot be sustained, since the charge of disturbing the peace, for which reason appellants say they were arrested, has been stetted in the case of Williams, and resulted in a verdict of "not guilty" in the case of Jones. The appellant Williams urges further that her conviction should be set aside because a juror's affidavit discloses that the jury was influenced by race prejudice.

Appellants are two young Negro women, native Baltimoreans, employed by the Government in Washington, D. C. They returned to Baltimore to visit their families on Christmas Day, 1952. Arriving at the Pennsylvania Railroad Station, they sought transportation to northwest Baltimore. They observed a taxicab waiting to pull out of line. It was already occupied by another passenger, a Negress desiring to go to Orleans and Wolfe Streets, in east Baltimore. Before the driver lowered the meter flag the appellants put their bags on the front seat of the cab and occupied the rear seats.

Appellants' version can be given in Mrs. William's words: "The driver," she testified, "looked at us and said: 'You hit me with that bag. I don't have to take that.' We looked at him. He said, 'I don't have to take you where you are going.' I said: 'You are driving a public vehicle. You are supposed to take us where we are going.' He insisted we get out. In the meantime, the first passenger in stepped across Miss Jones and me and got out. Then the dispatcher came up and asked us, Do you want a cab? Just then the driver had gotten out of the cab and had put our bags on the platform. I said, No, we already have a cab." An unyielding position was maintained by the appellants despite the cab driver's demand that they leave his cab and by the cab driver despite the original occupant's leaving the cab to engage another.

A dynamic element was introduced into the impasse by the arrival of two police officers who had been called at the cab driver's instance by the radio dispatcher. The story is told by appellant Jones as follows: "We stayed in the cab and within a matter of minutes, up comes this patrol wagon and two officers. Officer Cordwell opened the door and said, 'Come here, you.' He pulled me out of the taxi and literally threw me in the wagon. While he was pulling me out, Mrs. Williams said to him: 'You are hurting her.' He said: 'You shut up because you are coming too.'"

Such was the appellants' account. Omitted from the appendix of appellants' brief is all testimony that would tend to indicate the State's version that the appellants created a disturbance and pushed, shoved, and kicked the officers before any arrest was attempted. At the trial both police officers and a starter for the Yellow Cab Company testified that the appellants created "noise and commotion" by stomping their feet on the floor of the cab and by using loud and profane language. The officers also stated that when they approached the taxicab and before they had chance to speak to the two women, appellant Jones threw a hat box at Officer Schne-

blein and then came out of the cab and grabbed the officer by the lapels and started to shake him. Officer Schenblein said on the witness stand, "Yes, had her hands on both lapels of my coat. I said, 'We are here to investigate a complaint. I don't know who is wrong. If you give me time, maybe I can help you. Relax, I will try to help you.' She said: 'I don't need help from you or no other white (profanity). Anybody who wears that uniform, I have no respect for.' " Miss Jones, according to the officers, was then placed under arrest but she "jumped back in the cab." Officer Cordwell testified, "I reached in the cab and told her she was under arrest, to come out of the cab. With that, the Williams woman, sitting on the left rear, kicked at me with her left foot. She missed me. Then she swung around and hit me on the right shoulder with her hand." It was testified that Mrs. Williams said, "Get your hands off her. You don't know who you are locking up. You don't know who you are fooling with." Appellant Willimas was then also placed under arrest. The account given by the officers is supported by the cab driver.

We are asked to conclude from the evidence that the cab driver's refusal to permit the appellants to use his cab was a manifestation of racial prejudice and we are urged to hold that all subsequent events should be viewed in the light of this alleged initial discrimination. Whatever one might think of the driver's behavior, the suggestion that race prejudice must have motivated him is not established. He was, it appears, willing to serve his original passenger, a Negro woman desiring to go to Orleans and Wolfe Streets in east Baltimore. Why would he decline service to others of the same race on the same ride, since he was already committed to a Negro customer? It was not a case of rejecting Negro passengers to give preference to white.

Especially incomprehensible and not to be explained as racial antagonism is the cab driver's alleged conduct, if we assume the appellants' version that they had not yet told him their destination, and that he did not learn

until they were at the Police Station that their homes were in northwest Baltimore. His version was that he declined their patronage in the first instance because he was committed to a patron going in the opposite direction. If nothing had happened to offend him, justifiably or otherwise, or to cause him to refuse to carry the appellants where they wished to go, since appellants say he did not know at the time that their destination was in the opposite direction from the other passenger, and if his sole objection to them was on account of their race, one is at a loss to reconcile this with the undisputed fact that he already had accepted a Negro passenger without objection. However this may be, the issues we are called upon to decide do not turn on the racial attitude of the cab driver.

There was further testimony by State's witnesses that at the police station appellant Jones slapped, scratched and kicked Matron Poole and bit the finger of Officer Schneblein, for which he was treated at the hospital.

Indictments charging disorderly conduct and assault and battery were returned in the usual form. The appellant Jones was tried first, in the Criminal Court of Baltimore City by the court (Cullen, J.) sitting without a jury. Her indictment charged disturbance of the peace, and assault and battery upon Police Officer Schneblein and assault and battery upon Matron Poole. Verdict was withheld by the Judge pending disposition of the Williams case which was later tried before a jury. Appellant Williams was found guilty of disturbing the peace and of assault and battery upon Police Officer Cordwell. A motion for a new trial was granted by the Supreme Bench of Baltimore City to the appellant Williams on the count for disturbing the peace and this was subsequently stetted by the State. Her motion was denied as to the conviction for assault. The Judge then entered his verdict which he had been holding in abeyance as to the appellant Jones. He found her guilty of assault and battery upon Police Officer Schne-

blein and Matron Poole and not guilty of disturbing the peace, following in substance the view taken by the Supreme Bench in the Williams case.

## I.

In their printed brief the appellants completely ignored the State's testimony of alleged assaults, contenting themselves with denial of the alleged disorderly conduct. At the hearing of the appeal their position was that they were guilty of no disorder, and no assault prior to their arrest; that the policemen arrested them without having witnessed any disorder or other violation; and that any assault on the officers which may have occurred at the railroad station or at the police station was therefore legally justified as resistance to unlawful arrest.

Appellants insist that all acts preceding their arrest are merged in the charge of disorderly conduct; that the Judge's verdict that appellant Jones is not guilty of disorderly conduct is *res judicata* as to prior events; and that the State's stetting of this count in the companion case places appellant Williams in the same position. They reason that the failure of the charges of disorderly conduct renders the arrests unlawful and makes the assault cases fatally defective.

This contention ordinarily could not be considered by this Court because of the appellants' failure to comply with Rule 39, Sec. 1 (e) of the Rules of the Court of Appeals by the omission of testimony material to, if not controlling of, the point. This Court has repeatedly warned that the rule does not allow appellants to pick out of the testimony only the portions they consider favorable to themselves, and leave out all of the remainder, but that the rule requires appellants to print in the appendix everything the Court has to have before it to decide the question presented. *Strohecker v. Schumacher,* 185 Md. 144; *Condry v. Laurie,* 186 Md. 194; *Butler v. Reed-Avery Co.,* 186 Md. 686; *Foley v. Hoffman,* 188 Md. 273, 288; *Grimm v. Virts,* 189 Md. 297, 299;

*Naughton v. Paul Jones & Co.,* 190 Md. 599, 604; *Platt v. Wilson,* 191 Md. 371; *Bishop v. Richard,* 193 Md. 6, 8; *Musser v. Citizens Bank of Takoma Park,* 195 Md. 100; *Sunshine Laundry Corp. v. White,* 197 Md. 582; *Seybolt v. Baber,* 203 Md. 20, 97 A. 2d 907; *Schwartzman v. Payne,* 203 Md. 256, 100 A. 2d 23; *Gmurek v. Kajder,* 203 Md. 437. The nature of the issue on appeal must in each instance be considered in determining whether Rule 39 has been complied with. In this case, by omitting material testimony and reproducing only selected portions of the record appellants have cast the facts in a context and light different than that appearing to the Court below. It is scarcely necessary to point out that what we are called upon to judge on this appeal is the case as it was presented in the trial court.

Where it is shown that an appellant in a criminal case has failed to reproduce in the appendix to his brief material testimony required under Rule 39, the appeal will be subject to dismissal, the same as in civil cases. *Hill v. State,* 190 Md. 698, 703. *Cf. Haley v. State,* 200 Md. 72, 75.

Apart from the operation of Rule 39, however, there are weighty reasons why appellants' contention cannot avail them. In the first place, even if we treat the appellants as exonerated on the counts for disorderly conduct "upon or near a public street" or in a "neighborhood," as provided in Article 27, Section 142, 1951 Code, and as charged in the indictment, their conduct may have constituted a violation of Article 27, Section 144, which makes it an offense to act in a disorderly manner in or about a railroad station, despite the fact that it is not on a public street. It may be that the Supreme Bench, which filed no opinion, was led to order a new trial of the disorderly conduct charge, by giving the appellant Williams the benefit of a strict interpretation of Section 142. Although appellants were not indicted for violating Section 144, such violation, if observed by the officers, would have justified the arrests.

If the triers of fact (the jury in one case and the Judge sitting without a jury in the other) believed the State's witnesses rather than the defendants, as they had a legal right to do, then they may well have concluded that the arrests were lawfully made because of a disorder committed by the two young women. Alternatively, the triers of fact, or later the Supreme Bench, might have accepted the defense version that they committed no disorder but may have found that they assaulted the policemen before any arrest was attempted, and that the arrests resulted from such assaults. In either view the Judge and the jury passing on their respective cases would be easily within the bounds of this record and in no sense inconsistent in holding the defendants guilty of assault.

We agree with the general proposition advanced by appellants that a peace officer may not arrest for a misdemeanor not committed in his presence, and also that one illegally arrested may use any reasonable means, even force, to effect his escape. *Sugarman v. State,* 173 Md. 52, 57. Since there was, however, ample basis for a finding by the jury and by the trial judge that the the arrests were legal because of misdemeanors committed in the officers' presence, we need not consider whether the force used at the railroad station and later at the police station was justified as an effort to escape.

Moreover, even if the two findings were inconsistent, acquittal on the disorderly conduct charge does not necessarily result in the conclusion urged upon us by appellants, that the assault charges must fail. A similar argument was rejected by this Court at this term, in *Leet v. State,* 203 Md. 285, 100 A. 2d 789. There it was held that a conviction on one count may stand even in the face of an inconsistent acquittal on another count. Each count of an indictment is regarded as if it were a separate indictment, and the inquiry is whether the evidence is sufficient to support the conviction on that count without regard to the disposition of other counts. It may also be noted that in the Williams case the count

for disorderly conduct was stetted, and there was actually no acquittal.

The failure of this appellant during her trial by the jury to request a directed verdict under Rule 5A of the Criminal Rules of Practice and Procedure technically would prevent consideration of the sufficiency of the evidence. *Auchincloss v. State*, 200 Md. 310; *Leet v. State, supra,* and cases therein cited. However, appellant Jones, having been tried by the court sitting without a jury, may have this Court determine whether in law the evidence is sufficient to sustain the conviction; but, under the Rule, the verdict of the trial court may not be set aside on the evidence, unless clearly erroneous, and we are required to give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 7, Criminal Rules of Practice and Procedure; *Diggins v. State,* 198 Md. 504.

Upon review of the record, we cannot say that in either of the two cases the verdict was insufficiently supported as a matter of law or was clearly erroneous.

## II.

The final contention to be considered arises only in the appeal of Mrs. Williams and relates to events alleged to have happened in the jury room after the jurors retired to consider their verdict. Following her conviction she filed a motion for a new trial asserting among other reasons that the conviction was "based upon the racial prejudice of the jurors." In support of this ground, she produced the affidavit of juror Number 5, reading as follows: "This was an all white jury. From the beginning of the discussion in the jury room it was the race of the defendant, not the facts, which were weighed by the majority of the jurors. They freely discussed the race of this girl and said that where colored people are concerned the police have got to be right. Bandied back and forth between the jurors were the statements that these colored people are smart alecs, especially the educated ones; that they overassert their

rights; that we must teach them a lesson. Four of the jurors, including myself, were for complete acquittal at the first of the discussion. A fifth juror was undecided. The other jurors kept hammering at us. One of the jurywomen exclaimed to me, 'You're taking that colored girl's word against the police. You must be in trouble with the police!' I told her I had never been in trouble with the police, that I had many friends who were police officers, but I felt this girl was innocent. The last half hour, I held out alone. I finally threw in the towel when some of the jurors accused me of being a 'nigger-lover.' "

In ordering a new trial on the count for disorderly conduct and denying the motion for a new trial insofar as it related to the assault upon Officer Cordwell, the Supreme Bench, as has already been noted, filed no opinion. We are, therefore, unable to say what consideration it gave the affidavit. Appellant Williams contends that "it was error for the Supreme Bench to overrule the motion for a new trial on the charge of assault on an officer, because of the misconduct of the jury."

Of course, this Court does not entertain appeals from rulings on motions for new trial. In Article 27, Section 711, 1951 Code, it is provided that "all motions for new trials in criminal cases shall be heard by the Court in which said motion is pending, or by the Supreme Bench of Baltimore City in cases of motions for new trials pending in the Criminal Court of Baltimore City, within ten days after the filing of said motion." See also Rule 30, Rules of the Supreme Bench of Baltimore City. In this State a motion for a new trial is addressed to the discretion of the court in criminal as well as civil cases, and from an order overruling such a motion no appeal will lie. *Archer v. State,* 45 Md. 457; *Miller v. State,* 135 Md. 379, 382; *Myers v. State,* 137 Md. 482, 487; *Boscoe v. State,* 157 Md. 407, 410; *Wilson v. State,* 181 Md. 1, 8; *Quesenbury v. State,* 183 Md. 570, 572; *Haley*

*v. State, supra. Cf. Snyder v. Cearfoss,* 186 Md. 360, 367.

It is strongly urged upon us that the Supreme Bench should have considered the affidavit of the juror and that it failed to do so. We do not agree, but think on the contrary that under the precedents the affidavit should have been given no consideration; although, if the Supreme Bench had granted the motion, for whatever reason, it would have been beyond the province of this Court to set its action aside. See *Snyder v. Cearfoss, supra.*

The law in Maryland is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake. *Browne v. Browne,* 22 Md. 103, 113. The reasons for the rule have been stated by this Court in *Brinsfield v. Howeth,* 110 Md. 520, 530, in these impressive words: "Such evidence is forbidden by public policy, since it would disclose the secrets of the jury room and afford an opportunity for fraud and perjury. It would open such a door for tampering with weak and indiscreet men that it would render all verdicts insecure; and, therefore, the law has wisely guarded against all such testimony and has considered it unworthy of notice. It would be a most pernicious practice, and in its consequences dangerous to this much valued mode of trial, to permit a verdict, openly and solemnly declared in the Court, to be subverted by going behind it and inquiring into the secrets of the jury room."

Other risks sought to be averted, it has been said, are harassment of jurors by disgruntled losing parties; removal of an element of finality from judicial decisions; and through allowing jurors to swear to alleged examples of reprehensible conduct, a decrease in public confidence in the judicial process. In an offer to prove facts nullifying the verdict on a motion for a new trial, the theory for exclusion of the jurors' deliberations during retirement, their expressions, argumented, motives, and beliefs, may, according to Prof. Wigmore, embrace both

the Privileged Communications Rule and the Parol Evidence Rule. 8 *Wigmore, Evidence,* Secs. 2346, 2348.

The general rule that a juror will not be heard to impeach his verdict was given its initial impetus as early as 1758 by Lord Mansfield in *Vaise v. Delaval,* 1 T. R. 11, 99 Eng. Rep. 944. The Supreme Court modified the rule of *Vaise v. Delaval,* in *United States v. Reid,* 53 U. S. (12 How.) 361, and may be said to have accepted a distinction between mental processes of the jurors and overt acts of extraneous influence, allowing evidence as to the latter, but excluding the former. This relaxation of Lord Mansfield's doctrine has come to be called the "Iowa Rule," from the opinion of the Iowa Supreme Court in *Wright v. Illinois and Mississippi Telegraph Co.,* 20 Iowa 195. It would permit affidavits and testimony of jurors for the purpose of correcting a clerical mistake in the jury's uttered verdict or to avoid the verdict because of irregularities of conduct, among which are intoxication, separation, private view, consultation of witness or party, acceptance of bribes, and reading of illegal documents. *Bateman v. Donovan,* 131 F. 2d 759, 765. The Supreme Court in *Mattox v. United States,* 146 U. S. 140, clearly established this as the rule in the federal courts.

The *Mattox* case, however, indicates that even the "liberal" Iowa Rule would not avail appellant Williams in the present appeal. Chief Justice Fuller wrote in that case: "The subject was much considered by Mr. Justice Gray, then a member of the Supreme Judicial Court of Massachusetts, in *Woodward v. Leavitt,* 107 Mass. 453, where numerous authorities were referred to and applied, and the conclusion announced, 'that on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence

operated upon his mind.  So a juryman may testify in denial or explanation of acts or declarations outside of the jury room, where evidence of such acts has been given as ground for a new trial.' " (at p. 149)

The latest Supreme Court decision dealing with the problem, *McDonald v. Pless*, 238 U. S. 264, seems, in language at least, to tend towards return to the stricter rule of exclusion formulated by Lord Mansfield.  The defendant moved for a new trial on the ground that a verdict was reached by the jurors' agreeing to a "quotient verdict."  In upholding the exclusion of the jurors' testimony, the Supreme Court expounded the reasons.  "The rule," Justice Lamar said, "is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils.  When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.  These two conflicting considerations are illustrated in the present case.  If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict.  But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.  If evidence thus secured could be thus used, the result would be to make what was intended to be

a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." (at 267)

While there has been some criticism of the federal rule as declared in *McDonald v. Pless* (see *Jorgensen v. York Ice Machinery Corporation,* 160 F. 2d 432, 435, *cert.* denied 332 U. S. 764; Note, 47 *Col. L. Rev.* 1373), "it is beyond doubt a settled rule that jurors in the federal courts will not be heard 'for the purpose of impeaching the verdict returned where the facts sought to be shown are such that they essentially inhere in the verdict,'" *Rakes v. United States,* 169 F. 2d 739, 745, *cert.* denied 335 U. S. 826; *Edwards v. District of Columbia,* 68 A. 2d 286, 288. The federal rule has been summarized by Wigmore as making inadmissible jurors' misunderstandings, motives, beliefs and improper remarks and the like. See *8 Wigmore,* Sec. 2349.

We have been referred to no case, and careful independent research has disclosed none, where a verdict was set aside on appeal in any jurisdiction, because of fallacious, unfair or biased arguments advanced by jurors to one another in their deliberations.

In Maryland there has been no deviation from the rule that what takes place in the jury-room ought to be, as it generally is, known only to the jurors themselves and that their testimony cannot in general be heard to impeach their verdict, whether the conduct objected to be misbehavior or mistake. *2 Poe, Pleading and Practice at Law,* Sec. 348. The rule was first recognized by this Court as early as 1831 in *Bosley v. Chesapeake Insurance Company,* 3 G. & J. 450, footnote at 473, and approved in *Ford v. State,* 12 Md. 514. In *Browne v. Browne, supra,* this Court held inadmissible and properly excluded by the trial judge on a motion for new trial the affidavits of four jurors that one of their number was suffering from an illness during the trial and that they assented to a verdict believed by them to be erroneous in order to obtain his release from the confinement of the jury room.

The reasons assigned in *Brinsfield v. Howeth, supra,* for rejecting the affidavits have been stated above, but the facts therein recited should now be set out, for the pressures said to have been exerted against the juror there are so closely analogous to those claimed in the case before us. In support of a motion for a new trial, the defendant offered an affidavit of a juror to the effect that after the jury had retired to its room to consider the case he was in favor of a verdict for the defendant, and held out for several hours for that finding; that several of the jurors became very angry and swore at him; that there were violent oaths used, and that certain of the jurors intimated that he had been "bought"; that they told him that he would be a ruined man around the Court House if he did not agree to a verdict for the plaintiff; that they said that the defendant had "bought" certain witnesses; and that but for these threats and representations he would never have agreed to a verdict for plaintiff, a verdict that in his judgment was not warranted by the evidence. The trial court refused to receive this affidavit in evidence at the hearing of the motion. This Court found no error in the exclusion and also said that, even if admitted, such affidavits are entitled to very little consideration, and would not be sufficient in themselves to disturb the verdict.

We have in the case at bar an affidavit which attempts to portray a chain of discussion among twelve jurors. One juror gives his impression; it may be very different from the picture the others would supply. To admit these possible conflicting versions would launch new and interminable inquiries, opening dangers as great as and perhaps greater than those we would guard against.

The latest Maryland case pointed out that even though a juror's affidavit, or testimony tending to prove the fact set forth in the affidavit, might be introduced in an appropriate independent criminal proceeding, under no circumstances would it be admissible to impeach the juror's own verdict at the hearing of the motion for a new trial. *Kelly v. Huber Baking Co.,* 145 Md. 321, 328.

It would serve no useful purpose to classify the Maryland cases as following the strict Lord Mansfield's rule, the "Iowa Rule," or some intermediate rule. We do not believe that the rule as formulated in the Supreme Court cases or as declared in other jurisdictions would permit a juror to give evidence of arguments made in the jury room or of his motives in assenting to the verdict. The Maryland cases happen to be chiefly, but not exclusively, civil, but as will be seen from the above discussion of Federal and State cases elsewhere the same principles have been applied in criminal cases. It suffices to say that under the Maryland law the affidavit of a juror is inadmissible as evidence at the hearing on the motion for a new trial, and there is no sound basis for a distinction between civil and criminal cases in this regard.

We look upon a claim that a litigant has been denied justice on account of his or her race, as raising an issue of utmost gravity. This Court has shown in its decisions that it is not insensitive to assertions that there has been a denial of equal treatment because of racial considerations. For this reason we have overlooked a number of technical considerations which might well have terminated these appeals, and have preferred to deal with the substantial questions involved. We cannot, however, ignore the rules as to the manner in which claimed prejudice may be shown, or the cogent reasons based on long experience and established policy which underlie these rules.

*Judgments affirmed with costs.*