957 A.2d 640

**Darren Joseph TATE**

v.

**STATE of Maryland.**

No. 0284, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Oct. 2, 2008.

Celia A. Davis (Nancy S. Forster, Public Defender, on brief), for Appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: KRAUSER, C.J., LAWRENCE F. RODOWSKY, (retired, specially assigned) and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

## ON REMAND

MOYLAN, J.

On September 27, 2007, we filed an opinion affirming the conviction of the appellant, Darren Joseph Tate, for the sexual abuse of his 16–year–old stepdaughter. 176 Md.App. 365, 933 A.2d 447. On June 9, 2008, the Court of Appeals filed a per curiam order vacating our decision and remanding the case to us "for further consideration in light of *Lawrence Price, Jr. v.*

*State of Maryland,"* 405 Md. 10, 949 A.2d 619 (2008). We have reconsidered and see no reason for changing our decision, which we hereby reinstate.

In *Price v. State,* the Court of Appeals expressly changed the common law of Maryland, which had in numerous cases over the course of 55 years held that, in jury trials in criminal cases, an apparent logical inconsistency between an acquittal on one charge and a conviction on another will not be interfered with by the courts and will not mandate the reversal of the conviction. *Leet v. State,* 203 Md. 285, 293, 100 A.2d 789 (1953); *Williams v. State,* 204 Md. 55, 64, 102 A.2d 714 (1954); *Ford v. State,* 274 Md. 546, 552–53, 337 A.2d 81 (1975); *Mack v. State,* 300 Md. 583, 601, 479 A.2d 1344 (1984); *Shell v. State,* 307 Md. 46, 54, 512 A.2d 358 (1986); *Wright v. State,* 307 Md. 552, 576, 515 A.2d 1157 (1986). And see *Hudson v. State,* 152 Md.App. 488, 515, 832 A.2d 834 (2003); *Price v. State,* 172 Md.App. 363, 388–90, 915 A.2d 432 (2007). Our traditional caselaw uniformly recognized that an inconsistent acquittal on one charge following a conviction on a closely related charge may simply have reflected either 1) a permitted compromise among the jurors or 2) an extension of lenity toward a defendant by declining to "pile on" with multiple convictions. That prevailing Maryland view, moreover, was solidly in line with the clear majority of American states and the federal courts. See Eric L. Muller, *The Hobgoblin of Our Little Minds? Our Foolish Law of Inconsistent Verdicts,* 111 Harv. L.Rev. 771, 787 n. 80 (1998). The approach to the problem of apparent jury inconsistency followed the reasoning of such eminent authorities as Judge Learned Hand in *Steckler v. United States,* 7 F.2d 59, 60 (2d Cir.1925); Justice Holmes in *Dunn v. United States,* 284 U.S. 390, 392, 52 S.Ct. 189, 76 L.Ed. 356 (1932); and Chief Justice Rehnquist in *United States v. Powell,* 469 U.S. 57, 61–67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984 ). All of that, however, has now been changed diametrically.

## I. Our Basic Holding

That change, however, does not affect our basic decision in the present case. The appellant had contended that the jury's

acquittal of him on the charge of having committed a fourth-degree sexual offense was logically inconsistent with its conviction of him for sexual child abuse. Our primary holding, however, was that the two verdicts were not necessarily inconsistent at all. Our holding was clear.

Our conclusion is that *the two verdicts were not necessarily inconsistent at all.* With the failure of the appellant's central thesis, his indirect attack on the inadequacy of Judge McKee's preventive measures self-evidently founders. *There was nothing inconsistent and, therefore, nothing even arguably erroneous about the verdicts.* The appellant's indirect attack on what Judge McKee did or did not do, therefore, reduces itself to the claim that Judge McKee failed to take all necessary measures to prevent non-error. That is simply not a cognizable appellate contention.

176 Md.App. at 380, 933 A.2d 447 (emphasis supplied).

Our subsequent discussion about the prevailing law as to inconsistent jury verdicts was simply a secondary and "totally independent reason" for affirming the conviction. That entire discussion, moreover, was predicated on an *arguendo* assumption. Our ultimate decision would have been, and is, the same even had that back-up rationale been unavailing.

*The appellant cannot prevail* on this first and primary contention about inconsistent verdicts *for another and totally independent reason.* Even if, purely *arguendo,* everything we have said to this point were wrong and the two verdicts were, indeed, as inconsistent as inconsistent can be, it would still make no difference to the outcome of this case.

176 Md.App. at 381, 933 A.2d 447 (emphasis supplied).

### The Verdicts Were Not Inconsistent

At the outset of our analysis, we recognized that the factual battle was far less about what had happened between the appellant and his stepdaughter than about the significance of what had happened. Even if the two crimes being compared, one leading to a conviction and the other to an acquit-

tal, had arisen out of precisely the same physical happening, they did not necessarily generate the same significance.

The area of factual disagreement between the State and the defense is narrow. It is not nearly so much a disagreement over what happened as it is a disagreement over the significance of what happened.

*Id.* at 374, 933 A.2d 447.

Key to our conclusion that the two verdicts might well have been completely compatible with each other was the testimony of the 16–year–old stepdaughter. We described that testimony:

The victim, Koree Buffington, had just turned 16 years of age when the act of alleged child abuse took place. She was 17 years old at the time of trial. The appellant is her stepfather, with whom Koree had been living as part of the same household. The household consisted of Koree, her mother, the appellant, Koree's grandmother, Koree's sister, a cousin, and a nephew. According to Koree herself, *she and the appellant had always had a "close" relationship with each other. She described how they would regularly "hang out and just ride to school together" and how "they would joke and play-fight with one another."*

In her trial testimony, Koree described the abusive incident. On a day several days after Koree's 16th birthday, the appellant knocked on Koree's bedroom door and she told him to come in. "After he came in, I was like sitting on the floor and he then pulled me up and put my hands around him, and he started touching me." She testified that the appellant placed her hands around his neck and then "he like took my hands down, and I hugged him like around where his waist was." *Koree's critical testimony was that while the appellant was holding her, he put his hands inside her underwear.* "He started rubbing outside my vagina." After that, the appellant "just started hugging me, and told me he loved me, and left."

... Koree elaborated that while *she had a "playful relationship" with the appellant,* it was "not O.K. for him to

kiss her." *She added that she did not believe that the appellant was trying to hurt her.*

176 Md.App. at 370–71, 933 A.2d 447 (emphasis supplied).

As this case unfolded, the appellant's insistent position was not that, in the course of roughhousing, he might not have inappropriately touched his stepdaughter but that he had not done so for any purpose of "sexual arousal or gratification." A co-worker of the stepdaughter who confronted the appellant on her own initiative testified:

> According to Ms. Tribble, *the appellant neither admitted nor denied the accusation.* According to her testimony, "[H]e did share the possibility [that] if there's anything he's guilty of, its playing rough with his daughters or sometimes not knowing when enough is enough."

*Id.* at 372, 933 A.2d 447 (emphasis supplied).

The testimony of the investigating detective was to the same effect. As we summarized it:

> The third and final State's witness was Detective Wayne Pyles, who reported the responses of the appellant when confronted with the accusation. In a written statement, the appellant averred that he had no recollection of ever having touched his stepdaughter's breast or vagina. The appellant added a message to Koree in which he said:
>
> > Because what you said happened, I'm so sorry. I love you. Daren.
>
> *When Detective Pyles then asked the appellant if he was "apologizing to Koree because you fondled her breasts and vagina?," the appellant declined to answer because, he told the detective, "the word 'fondled' implied a sexual intent." The appellant told Detective Pyles that "Koree was not lying," but that he steadfastly denied doing "anything of a sexual connotation."*

*Id.* (emphasis supplied).

The appellant took the stand in his own defense. His testimony did not disavow the possibility of an inappropriate

touching but strenuously disavowed any sexual intent or purpose behind such a touching.

> He added that Koree was very "tomboyish" and physical and that, in interacting, *the two of them would wrestle, box, and "we would touch." He did not deny touching Koree* because, as *he explained,* "We play all the time, *for me to say I have never touched her would be for me to just outright lie."* He further explained that he wrote the apology to Koree after speaking with Detective Pyles "because it deeply hurt me to think that she took anything, or our playing, in any kind of sexual way." *He concluded that the incident in question did not happen in the way that Koree reported it. The two of them were "just playing at the time."*

*Id.* at 373, 933 A.2d 447 (emphasis supplied).

Also called to the stand on the appellant's behalf were his wife (the victim's mother) and his 18-year-old daughter, both of whom testified that although the appellant and his stepdaughter "played a lot" and indulged in "a lot of roughhousing," they had never observed "any behavior of a sexual nature between the two." Our conclusion was that the appellant's persistent and apparently credible strategy of confession and avoidance may well have driven a wedge, in the jurors' minds, between the charge of sexual child abuse, which arguably requires no more than objective behavior that has an adverse sexual impact on the victim, and the charge of a fourth-degree sexual offense, which requires subjectively that the sexual conduct be committed with the specific intent of producing "sexual arousal or gratification."

> It takes no stretch of the imagination to conclude that *the jury may have found the appellant's behavior to have been inappropriate but may also have believed the appellant that his actions were not motivated by "sexual arousal or gratification."* All that would be required, of course, is that the jury (or *some of the jurors) were not persuaded* beyond a reasonable doubt *that his actions were specifically intended "for sexual arousal or gratification." That,* indeed, *was the heart of the appellant's defense,* to wit, *that he may have*

*touched Koree inappropriately but that he did not do so for sexual purposes.* The very success of the appellant's defense may well be the obvious explanation for the appellant's acquittal on the fourth-degree sexual offense charge, notwithstanding his conviction for sexual child abuse. *The appellant worked hard for that allegedly inconsistent verdict and should be happy in his success.*

176 Md.App. at 380, 933 A.2d 447 (emphasis supplied).

### A Common Factual Event

Both the sexual child abuse charge and the fourth-degree sexual offense charge, to be sure, proceeded from the proof of a common fact. That fact standing alone, however, does not *ipso facto* establish either crime. We described the common fact.

The gravamen of the State's case against the appellant, both for the sexual abuse of a minor pursuant to Maryland Code, Criminal Law Article, § 3–602(b), and for the fourth-degree sexual offense pursuant to § 3–308(b)(1), is Koree's testimony that the appellant put his hands in her underwear and "started rubbing outside my vagina." *That is the limited factual fulcrum upon which guilt or innocence for either of the criminal charges turns.* It was that act of "rubbing outside [Koree's] vagina" that was the *sine qua non* of the appellant's sexual abuse of Koree. It was that act of "rubbing outside [Koree's] vagina" that was the *sine qua non* of the appellant's non-consensual sexual contact with Koree that allegedly constituted a fourth-degree sexual offense.

*Id.* at 374, 933 A.2d 447 (emphasis supplied).

The "rubbing outside the vagina" was a necessary fact, but it was not a sufficient fact. It would have been quite plausible for the jurors to have acquitted the appellant of a fourth-degree sexual offense even if they believed that that "rubbing outside the vagina" had occurred. The acquittal, therefore, did not necessarily represent a verdict that the touching never took place.

## The Appellant's Argument And Our Rejection of It

The appellant's argument, however, reduced what was before the jury to the most simplistic of terms. We characterized the argument:

From that predicate of a common factual basis for the two crimes, *the appellant constructs his thesis that* 1) the jury's conviction of him for sexual child abuse necessarily meant that the jury was persuaded beyond a reasonable doubt that the appellant did, indeed, "rub outside Koree's vagina" but 2) *the jury's acquittal of him for the fourth-degree sexual offense necessarily meant that the jury was persuaded that he had not "rubbed outside Koree's vagina."* As the appellant characterizes the verdicts, the jury was at one and the same time both convinced that "he did it" but not convinced that "he did it." *According to the appellant, the jury reached diametrically opposed and inconsistent verdicts that cannot be reconciled* and Judge McKee was in error for failing to take sufficient steps to forestall such inconsistency.

*Id.* (emphasis supplied).

We rejected the appellant's argument that the acquittal on the sexual offense charge had necessarily precluded the finding of an element that was indispensable to a conviction on the sexual child abuse charges. We concluded that the acquittal for the fourth-degree sexual offense could have been for a variety of reasons other than that the jury believed that the appellant had never "rubbed outside Koree's vagina." We then undertook to explore what some of those other reasons might be.

*The appellant's characterization of the verdicts,* however, *is much too simplistic.* The flaw in the appellant's logic is that one of the premises on which he relies is not necessarily true. *The acquittal of the appellant for a fourth-degree sexual offense does not, even on the particular facts of this case, necessarily mean that the jury was not persuaded beyond a reasonable doubt that the appellant had "rubbed outside Koree's vagina."* Even given the jury's persuasion of that predicate fact, *a fourth-degree sexual offense may*

*require something more. The acquittal on the fourth-degree sexual offense charge could well have come about for either of two different and arguably plausible reasons.* One concerns the *actus reus* of a fourth-degree sexual offense. The other concerns its *mens rea.*

*Id.* at 375, 933 A.2d 447 (emphasis added).

### Sexual Child Abuse Is a Broader Crime Than a Fourth–Degree Sexual Offense

Our analysis began with the general proposition that sexual child abuse is broader than, *inter alia,* even a closely related sexual offense and that, even granting a substantial overlap in the respective coverages, it may be established even though the related sexual offense has not been completely established. Maryland Code, Criminal Law Article, § 3–602(a)(4) defines sexual child abuse as follows:

(4)(i) "Sexual abuse" means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not.

(ii) *"Sexual abuse" includes:*

1. incest;

2. rape;

3. *sexual offense in any degree;*

4. sodomy; and

5. unnatural or perverted sexual practices.

(Emphasis supplied).

Although "sexual abuse" includes those five statutorily listed examples, it most definitely is not limited to those examples. Judge Cathell was very empathic on that point in *Degren v. State,* 352 Md. 400, 428, 722 A.2d 887 (1999):

Section 35C(a)(6)(ii) [the substantively unchanged predecessor to what is now § 3–602(a)(4) of the Criminal Law Article] enumerates actions describing types of sexual abuse, but *the general phrase, "Sexual abuse includes, but is not limited to" precedes the enumerated list and states specifically that the list is not exhaustive.* Furthermore,

given general legislative policy and the purpose of the child abuse statute to protect minors from abuse, *we find it difficult to believe the General Assembly chose to limit the forms of sexual abuse punishable to only those listed in section 35C(a)(6)(ii).*

(Emphasis supplied).

To be sure, the earlier version of the child abuse law, Art. 27, § 35C(a)(6)(ii), expressly stated that sexual abuse "includes, but is not limited to" the examples then listed, whereas the new codification, Criminal Law Article, § 3–602(a)(4), merely precedes the list of examples with the word "includes." The Special Revisor's Note to the 2002 recodification, however, explains that although there have been minor changes in wording, there has been no change in substance in the course of moving the offense from Article 27 to the Criminal Law Article. "Includes" still means "includes but is not limited to."

In *Nightingale v. State,* 312 Md. 699, 708, 542 A.2d 373 (1988), the Court of Appeals had also recognized that the crime of sexual child abuse is broader than the collective definitions of the statute's list of representative examples of sexual child abuse.

The problem, then, is that we cannot tell whether these general verdicts of guilty were based on the use of sexual offenses as lesser included offenses (or elements) of child abuse, or *whether the child abuse verdicts were based on other reasons (e.g., some sort of sexual molestation which the juries thought did not rise to the level of a sexual offense in any degree.)*

(Emphasis supplied).

After looking at the two crimes in the present case side by side, we concluded:

There may be the commission of sexual child abuse even if *none of the* five related offenses statutorily listed as *examples* of sexual child abuse *has been committed. The non-commission of so much as a single one of the latter*

*does not necessarily imply the non-commission of the former.*

176 Md.App. at 377, 933 A.2d 447 (emphasis supplied).

## A More Tightly Defined *Actus Reus*

We first compared the *actus reus* of sexual child abuse and the *actus reus* of a fourth-degree sexual offense, even in the limited context of allegedly illegal behavior consisting of an intentional touching by the defendant of a part of the victim's body. We asked whether the one *actus reus* is necessarily coterminus with the other, and concluded that all that is required for a touching to constitute sexual abuse is that it could be deemed to involve "sexual molestation or exploitation of a minor." That is open-ended language that could embrace a wide variety of physical contact. We then contrasted that open-ended language with the more tightly confined definition of a fourth-degree sexual offense.

The touching that may constitute a fourth-degree sexual offense, by contrast, is more tightly defined. It is spelled out by § 3–308(a):

(a) *Prohibited.*—A person may not engage in:

(1) sexual contact with another without the consent of the other.

Section 3–301(f), in turn, gives us a definition of what "sexual contact" consists of:

(f) *Sexual contact.*—(1) "Sexual contact", as used in §§ 3–307 and 3–308 of this subtitle, means *an intentional touching of the victim's or actor's genital, anal, or other intimate* area for sexual arousal or gratification, or for the abuse of either party.

(2) "Sexual contact" includes *an act:*

(i) *In which a part of an individual's body,* except the penis, mouth or tongue, *penetrates, however slightly, into another individual's genital opening* or anus; and

(ii) That can reasonably be construed to be for sexual arousal or gratification, or for the abuse of either party.

(3) *"Sexual contact" does not include:*

(i) *A common expression of familial or friendly affection.*

176 Md.App. at 377–78, 933 A.2d 447 (emphasis supplied).

We then looked closely at the testimony in this case against the backdrop of Judge Wilner's observation in *Cooksey v. State*, 359 Md. 1, 24 n. 1, 752 A.2d 606 (2000):

> Clearly there was no suggestion in this case that any part of the appellant's body ever penetrated, however slightly, into Koree's genital opening and subsection (2) can, therefore, be factored out of any further consideration. *The single, fleeting testimonial reference* to "rubbing outside my vagina" *does not tell us with anatomical exactitude precisely what that entailed.* In terms of the *actus reus*, it is possible, indeed probable, that the appellant's intentional "rubbing outside Koree's vagina" constituted an intentional touching of Koree's genital area, but that is not absolutely free of all uncertainty. *We are mindful of the caution displayed by Judge Wilner in Cooksey v. State, as he questioned whether "touching a person's buttocks" or "rubbing against the victim" amounted to sexual contact even though those actions might clearly represent "sexual molestation or exploitation" so as to constitute sexual child abuse.*
>
>> Section 461(f) of Article 27 [from which § 3–301(f) derives without substantive change] includes within the definition of "sexual contact" *the intentional touching of the victim's anal or genital areas* or other "intimate parts" for the purpose of sexual arousal or gratification. *Whether the touching of a person's "buttocks" would suffice as sexual contact is not clear. It might,* however, depending on the circumstances, *constitute sexual molestation or exploitation, even if it did not constitute sexual contact. The same situation could arise from "rubbing against" the victim.*

176 Md.App. at 378, 933 A.2d 447 (emphasis supplied).

Our conclusion was that a "rubbing outside Koree's vagina" might constitute the *actus reus* of sexual child abuse without

necessarily constituting the *actus reus* of a fourth-degree sexual offense of the touching variety.

There was no conviction for the fourth-degree sexual offense in this case, and we are not, therefore, called upon to resolve the still unresolved scope of the term "sexual contact." It is enough for us to note that *one or more of the jurors might possibly have concluded,* rightly or wrongly, *that "rubbing outside the vagina" did not constitute sexual contact within the contemplation of a fourth-degree sexual offense law even though it may have constituted "sexual molestation or exploitation" within the contemplation of the sexual child abuse law.* That possibility would eliminate any inconsistency between the conviction for sexual child abuse and the acquittal for a fourth-degree sexual offense.

176 Md.App. at 380, 933 A.2d 447 (emphasis supplied).

### A Subjective *Mens Rea* With a Specific Intent

The absence of any necessary inconsistency between the conviction and the acquittal stands out even more prominently, however, when one considers the subject of *mens rea.* The fourth-degree sexual offense statute expressly sets out as one of the elements of the crime the specific intent to commit the proscribed act "for sexual arousal or gratification." We pointed out that the criminal child abuse statute contains no such element of specific intent or special *mens rea.*

*The potential difference between a fourth-degree sexual offense and sexual child abuse is even more pronounced when we turn our focus on the mens rea of each offense. The sexual abuse of a minor pursuant to § 3–602 does not involve any specific intent or special mens rea.* An act of sexual contact, within the contemplation of §§ 3–301(f), 3–307, and 3–308, by contrast, requires the proof of a very particularized specific intent or special *mens rea. The intentional touching, whatever its scope, must be perpetrated "for sexual arousal or gratification, or for the abuse of either party."* § 3–301(f)(1). *There is no comparable mental requirement in the sexual child abuse law.*

In looking at all of the evidence in this case, *there is a strong possibility that the jury* (or some of the jurors) *could well have concluded that the appellant's unrestrained behavior may have amounted to sexual child abuse but that he did not harbor that specific intent of acting for "sexual arousal or gratification" necessary for a fourth-degree sexual offense.* Although he did not remember having done so, *the appellant* freely acknowledged that, in the course of playful roughhousing, he may well have touched Koree inappropriately but he *forcefully disclaimed any sexual purpose or orientation in his actions.*

176 Md.App. at 379, 933 A.2d 447 (emphasis supplied).

## What We Decided

We have painstakingly recapitulated our earlier decision step by step to make it unmistakably clear that we there held that the jury verdicts of acquittal of a fourth-degree sexual offense and conviction of sexual child abuse were not necessarily inconsistent with each other. We continue so to hold. Nothing in *Price v. State* persuades us to alter in the slightest degree what we decided and what we stated in that regard.

## II. A Secondary Conclusion

Risky though it sometimes is to advance a secondary rationale, we shall nonetheless venture one. As an additional and independent reason for deciding as we do on this reconsideration, we find significant solace in the well reasoned and articulate concurring opinion of Judge Harrell (joined by Judge Battaglia and in part by Judge Wilner) in *Price v. State.* It clarifies several vitally important issues that the majority opinion leaves in the dark and that could lead the unwary astray.[1]

---

1. We would imagine that a now fully constituted Court of Appeals might welcome the opportunity to revisit *Price,* whether to reaffirm it, to reverse it, or simply to endorse the important clarifications provided by the concurring opinion. Putting aside for the moment the concurring votes of Judges Harrell and Battaglia, the Price Court consisted of two active judges and three non-incumbent judges. While such a

## Factual Versus Legal Inconsistency

The distinction that the concurring opinion carefully points out between a true legal inconsistency and a mere factual inconsistency is indispensable to any reasonable application of *Price v. State*. Without that distinction the majority opinion could easily give rise to an epidemic of promiscuous inconsistency claims. (It probably will anyway, but the concurring opinion will at least help to contain the damage.)

In the present case, even if we were to assume, purely *arguendo*, that the two jury verdicts were inconsistent, that inconsistency would amount to the jury's findings that the "rubbing of the outside of the vagina" occurred in the sexual child abuse case but did not occur in the fourth-degree sexual offense case. That classically would be a factual inconsistency. Judge Harrell explained what factually inconsistent verdicts consists of.

A factually inconsistent verdict is one where a jury renders "different verdicts on crimes with distinct elements when there was only one set of proof at a given trial, which makes the verdict illogical." Ashlee Smith, Comment, *Vice–A–Verdict: Legally Inconsistent Jury Verdicts Should Not Stand in Maryland*, 35 U. BALT. L. REV. 395, 397 n. 16 (2006). *The feature distinguishing a factually inconsistent verdict from a legally inconsistent verdict is that a factually inconsistent verdict is merely illogical.* By contrast, a legally inconsistent verdict occurs where a jury acts contrary to a trial judge's proper instructions regarding the law. The difference between the two is perhaps best illustrated by examples from other jurisdictions.

*Assume a legally intoxicated* or otherwise reckless *driver causes a head-on collision, killing on impact the driver and*

composition of the Court would be unremarkable when it is deciding routine cases by applying existing law, there may be institutional constraints when the Court is involved in overt policy making by way of changing the law, as when it is involved, for instance, in amending the Maryland Rules of Procedure. These would seem to be considerations deserving of comment by a fully constituted Court of active judges, whose authority to decide policy questions is beyond challenge.

*passenger of the other car.* The intoxicated driver is charged with two counts of vehicular homicide. *The jury convicts the defendant of* vehicular homicide as to *the death of the driver* of the other car, *but finds the defendant not guilty of the same crime with regard to the death of the passenger. Such a result would constitute factually inconsistent verdicts.*

405 Md. at 35–36, 949 A.2d 619 (emphasis supplied).

A legal inconsistency, by contrast, occurs when the crime for which a defendant is acquitted is, in its entirety, a lesser included offense within the greater inclusive offense for which a defendant is convicted. The commission of the greater crime cannot, as a matter of law, take place without the commission of the lesser crime. The lesser crime is a required element of the greater. The acquittal of the lesser crime precludes the finding of that required element of the greater crime for which the defendant was convicted. That is legal, as opposed to factual, inconsistency. It is something that does not involve speculation about possible or probable factual findings. It is something that can be explained in algebraic terms.

The *Price* case itself contained a set of factually inconsistent verdicts as well as a set of legally inconsistent verdicts. The concurring opinion pointed out that the factual inconsistency would not, in and of itself, have been an occasion for reversing the conviction.

*The verdicts in the present case also contain a factual inconsistency.* Price was acquitted of being a felon in possession of a handgun, but convicted of possessing a handgun in the course of drug trafficking. There was no dispute at trial as to Price's prior felony convictions. Therefore, *it is illogical for the jury to find that Price is guilty of possessing a firearm in the course of drug trafficking without possessing a firearm as a convicted felon. Despite the illogical verdict, this does not rise to the level of a legally inconsistent verdict.* Thus, *if this were the only grounds for challenging Price's conviction* for possession of

a handgun in the course of drug trafficking, *his conviction should be affirmed.*

405 Md. at 37, 949 A.2d 619 (emphasis supplied). The majority opinion itself eschewed any reliance on this factual inconsistency.

### Wishing to Have One's Cake And Eat It Too

The most welcome breath of fresh air from the concurring opinion is its clarification of the procedure that must be followed if a defendant truly wishes to avoid the illogic of inconsistent verdicts.

> Because of the "sea change" announced by the Majority's opinion, *some prospective direction is necessary* and desirable to highlight the procedure required in order *for a defendant to preserve for appellate review a challenge to a legally inconsistent verdict.*

405 Md. at 40, 949 A.2d 619 (emphasis supplied).

Judge Harrell explained that more frequently than not it is the defendant who is the beneficiary of the jury's merciful inconsistency, and that the defendant should be allowed to enjoy the option of accepting the jury's boon of probably undeserved lenity. What the defendant may not do, however, is to have his cake and eat it too. The concurrence explained:

> *The jury may render a legally inconsistent verdict to show lenity to the defendant. The defendant should not be foreclosed from accepting the jury's lenity* as a result of the holding of the Majority opinion. Nevertheless, *we should not permit the defendant to accept the jury's lenity in the trial court, only to seek a windfall reversal on appeal by arguing that the jury's verdicts are inconsistent.* Accordingly, *a defendant must note his or her objection* to allegedly inconsistent verdicts *prior to the verdicts becoming final and the discharge of the jury. Otherwise, the claim is waived.* "If a defendant claims that a verdict is inconsistent to the point of being self-destructive, *he must present that claim to the circuit court before the jury is discharged; if he does not, he waives the claim.*"

405 Md. at 40, 949 A.2d 619 (emphasis supplied). *But cf. Southern Management Corp. v. Taha,* 378 Md. 461, 491–92, 836 A.2d 627 (2003).

As the concurring opinion points out, it is the prosecutor who most likely has the right to be aggrieved by the inconsistent acquittal rather than the defendant to be aggrieved by the inconsistent conviction. In *United States v. Powell,* 469 U.S. 57, 68, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), Justice (later Chief Justice) Rehnquist observed that inconsistency in verdicts is a problem that cuts both ways.

> *[R]espondent's argument* that an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound felony count simply *misunderstands the nature of the inconsistent verdict problem.* Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, *the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This,* of course, *is not necessarily correct;* all we know is that the verdicts are inconsistent. *The Government could just as easily—*and erroneously—*argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient.*

(Emphasis supplied).

In our own earlier opinion in this case, we ourselves noted that logical consistency *per se* is a two-edged sword.

> In cooling the sometimes overheated defense ardor in cases of jury inconsistency, the Supreme Court helped us to look at the issue with a more neutral perspective. *If logical integrity per se is, indeed, the controlling criterion, it is far more likely that it is the prosecutor who should be aggrieved by an illogical acquittal rather than the defendant who should be aggrieved by an illogical conviction.* The asymmetry of our judicial review, however, precludes the prosecutor from seeking to have the illogical acquittal vacat-

ed and a more logical conviction arbitrarily installed in its stead.

176 Md.App. at 394, 933 A.2d 447 (emphasis supplied).

As Justice Rehnquist noted in *United States v. Powell,* inconsistent verdicts present the quandary of "whose ox has been gored."

Inconsistent verdicts therefore present a situation where *"error,"* in the sense that the jury has not followed the court's instructions, *most certainly has occurred, but it is unclear whose ox has been gored.* Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. . . . For us, *the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest.*

469 U.S. at 65, 105 S.Ct. 471 (emphasis supplied).

Given a set of inconsistent verdicts, the defendant is at a distinct tactical advantage. The obvious cure for an inconsistency in verdicts would be to send the jury back to resolve the inconsistency: "Ladies and gentlemen of the jury, you can't have it both ways. Give us two acquittals or give us two convictions." The problem, of course, is that few defendants, enjoying the quite unexpected boon of an inconsistent acquittal, are willing to "roll the dice, double or nothing." Consistency for its own sake does not mean that much to them. They are prone to complain about the lack of consistency after it is no longer available, but are far from enthusiastic about pursuing consistency while it is still available. In the concurring opinion, Judge Harrell took note of the strategic options facing a defendant.

In fact, *quite often a defendant's optimal choice will be to remain silent,* thus waiving his challenge to the inconsistent verdicts and accepting the conviction that may be inconsistent. *A defendant,* aware of his or her guilt, or the overwhelming evidence of guilt, of all of the crimes of which he

or she stands charged, *may choose to accept the jury's lenity. A defendant may be wise to accept the inconsistent conviction* and accompanying sentence, *rather than look a gift horse in the mouth.* If the defendant objects to the inconsistent verdicts, *the jury, given a second chance, may choose to remedy the error in a manner not in the defendant's favor.*

405 Md. at 40 n. 9, 949 A.2d 619 (emphasis supplied).

 There is a small window of opportunity in which the jury may still be sent back to the jury room to resolve any troubling inconsistencies or ambiguities. At such a strategic junction, the defendant enjoys an immense advantage, but it is an advantage that must be exercised then and there. When inconsistent verdicts are rendered, the judge may not, *sua sponte,* send the jury back to resolve the inconsistency, because it is the defendant who is entitled, should he so wish, to accept the benefit of the inconsistent acquittal. By the same token, the prosecutor may not ask to have the jury sent back to resolve the inconsistency, because it is the defendant, once again, who is entitled, should he so wish, to accept the benefit of the inconsistent acquittal. The defendant is authorized to call the shots at that critical moment, but the defendant must call them before the moment passes. After that, the jury will be gone beyond recall. The defendant may not stand mute and later complain about the verdicts he did nothing to cure at the only time a cure was still possible. *United States v. Powell* confirmed that the power to cure the inconsistency lies exclusively in the control of the defendant.

[I]nconsistent verdicts—even *verdicts that acquit on a predicate offense while convicting on the compound offense— should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing*

or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

469 U.S. at 64–65, 105 S.Ct. 471 (emphasis supplied).

■ The concurring opinion spells out the obvious procedure that must be followed. It is the only procedure that makes sense. The defendant faces the choice either of having the jury resolve the inconsistency or of standing pat and enjoying the inconsistency. He has to decide "when to hold 'em and when to fold 'em." If he chooses the latter, he may not later complain. A defendant simply may not seek to exploit an alleged inconsistency without taking the necessary step to cure or resolve the inconsistency when it is still possible to do so. If a defendant chooses, on the other hand, to cast himself as the champion of jury verdict consistency, he must accept the perils of the part. As the concurrence stated:

*Upon timely objection by the defendant* to legally inconsistent verdicts, the trial court should instruct or re-instruct the jury on the need for consistency and the range of permissible verdicts. *The jurors then should be permitted to resume deliberation. The jury is free to resolve the inconsistency* either by returning verdict[s] in the defendant's favor, convicting on the implicated counts, or deadlocking on a charge *so that no inconsistent finding results.* "Until the announcement that the verdict has been recorded, the jury has the right to amend or change any verdict; and when it is so amended it is the real verdict of the jury and it may be properly accepted by the court." *Heinze v. State,* 184 Md. 613, 617, 42 A.2d 128, 130 (1945).

In sum, *a defendant must note his objection to the inconsistent verdict while the trial court has an opportunity to remedy the error, i.e., before the verdict is final and the jury is discharged. Failure to do so constitutes waiver.*

405 Md. at 41–42, 949 A.2d 619 (emphasis supplied).

■ In our case, the appellant clearly did nothing by way of objecting to the reception of the verdicts or by way of asking that the jury be sent back to resolve any alleged inconsistency

in its verdicts. The entire exchange as the jury came back into the courtroom was as follows:

THE DEPUTY CLERK: Ladies and Gentlemen of the Jury, are you agreed of your verdict?

THE JURY: Yes, we are.

THE DEPUTY CLERK: Who shall say for you?

THE JURY: Foreman.

THE DEPUTY CLERK: Mr. Foreman, how do you find in the Criminal Trial 05–0520X, State of Maryland versus Darren Joseph Tate, Count One: *Do you find the Defendant not guilty or guilty of child abuse by a family member?*

THE FOREMAN: *Guilty.*

THE DEPUTY CLERK: Count Two: *Do you find the Defendant not guilty or guilty of fourth degree sexual offense?*

THE FOREMAN: *Not guilty.*

THE DEPUTY CLERK: Count Three: Do you find the Defendant not guilty or guilty of second degree assault?

THE FOREMAN: Not guilty.

THE DEPUTY CLERK: Ladies and Gentlemen of the Jury, *harken to your verdict as the Court hath recordeth* it. Your Foreman sayeth, in Criminal Trial 05–0520X, the Defendant is guilty of child abuse by a family member, not guilty of child abuse—or fourth degree sexual offense and not guilty of second degree assault.

And so say you all?

THE JURY: Yes.

THE COURT: Thank you very, very much, Ladies and Gentlemen. Have a nice evening. We won't call you again for three more years. Thank you.

THE JURY: Thank you.

THE COURT: Anyone need a ride to their car or anything?

A JUROR: Is the shuttle still running. It's 6:00 o'clock.

THE BAILIFF: It runs until 7:00.

**138**

A JUROR: Okay.

THE COURT: Thank you very much.

Court is going to order a Presentence Investigation. I'll schedule this for sentencing on December the 30th.

(Emphasis supplied). The appellant was obviously content to stand pat.

All of this discussion about allegedly inconsistent jury verdicts, we hasten to reiterate, involves only our secondary and independent holding. For the reasons advanced in explaining our primary holding, we reaffirm the judgment of conviction against the appellant.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**